

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0592-10

---

### ROBERT JACKSON CRIDER, Appellant

### v.

### THE STATE OF TEXAS

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### COLLIN COUNTY

---

**COCHRAN, J., delivered the opinion of the Court in which MEYERS, PRICE, JOHNSON, KEASLER, HERVEY and ALCALA, JJ., joined. WOMACK, J., filed a dissenting opinion in which KELLER, P.J., joined.**

### O P I N I O N

A jury convicted appellant of driving while intoxicated after the trial judge denied his

motion to suppress evidence obtained from a search warrant for blood. The court of appeals

held that the search-warrant affidavit established probable cause to believe that evidence of

intoxication would be found in appellant's blood even though the officer did not specify

when, on the day before he obtained the search warrant, he had stopped appellant.[1]  We granted appellant's petition to address whether a search-warrant affidavit for blood must contain the time the DWI arrestee was stopped.[2]  This is a "bookend" case to *State v. Jordan*,[3] in which we recently held that the search-warrant affidavit for blood in a DWI case established probable cause even though the affidavit did not explicitly state when the officer stopped the defendant because it was obvious from the context.  Under the totality-of-the-circumstances standard set out in *Jordan*, the affidavit in this case is not sufficient to show probable cause because there could have been a twenty-five-hour gap between the time the officer first stopped appellant and the time he obtained a search warrant for blood.  We therefore reverse the court of appeals.

I.

Wylie Police Sergeant Anthony Henderson executed a search-warrant affidavit on June 7, 2008, stating that he had probable cause to obtain blood from appellant whom he had arrested for  DWI.  The affidavit stated:

> On or about 6-06-2008, I Sgt. A Henderson was stationary at the three way intersection of s/b E FM 544, Vinson Rd. And County Line Rd. When I observed suspect vehicle make a left hand turn onto n/b E FM 544 and Cedar Point.  Upon making contact, the driver identified themselves as CRIDER,

---

[1] *Crider v. State*, No. 05-09-00926-CR, 2010 WL 1294094 (Tex. App.—Dallas April 5, 2010) (not designated for publication).

[2] Appellant's first ground for review reads: "Because the affidavit did not contain the time that Appellant was stopped or arrested, did the search warrant issue without probable cause?"

[3] 342 S.W.3d 565 (Tex. Crim. App. 2011).

ROBERT JACKSON II.   I detected a strong odor of alcoholic beverage, bloodshot eyes and his speech was thick-tongued.  During Standardized field sobriety testing, I observed 4 clues during Horizontal Gaze Nystagmus, and CRIDER, ROBERT JACKSON II refused to perform the One Leg Stand Test and the Walk and Turn test.  While speaking with CRIDER, ROBERT JACKSON II outside his vehicle I observed him swaying heavily.  Based on these observations, the defendant CRIDER, ROBERT JACKSON II was arrested for driving while intoxicated.  Defendant CRIDER, ROBERT JACKSON II was asked to give a breath specimen, which [he] refused.

A Collin County magistrate issued a search warrant based on Sgt. Henderson's affidavit at 1:07 a.m. on June 7, 2008.

At the motion to suppress hearing, the defense argued, *inter alia*, that the affidavit failed to establish probable cause to search for alcohol in appellant's blood "because the alcohol does dissipate from the blood" and the officer failed to put the time he had observed appellant driving while intoxicated in the affidavit.  The time of the stop was required so that the magistrate "could have determined whether or not there was fresh probable cause. . . . Without that information, you can't determine whether or not to justify having blood forcibly taken from a citizen in the United States."

The prosecutor anticipated the defense argument "that there is a full day, June 6[th] of 2008, where this crime could have occurred, and being the nature of blood–or alcohol in blood either absorbing or eliminating, that because there's a 24-hour period, we need to know a more specific time because of the nature of the blood."  But the prosecutor argued that "it is reasonable to infer that an officer is not going to wait four hours, five hours, ten hours, 12 hours, 24 hours to get this warrant executed."  To think that an officer would wait around that

long "goes completely contrary to common knowledge and common sense." Furthermore, "[a]ny delay in time is beneficial to the defendant," so the officer is going to seek a search warrant for blood "as quickly as possible because not to do so would not benefit his ultimate objective[.]"

The trial judge noted the dearth of case law concerning staleness in a blood search warrant, and stated, "To tell you the truth, I think that we need some bright line law on the time on a search warrant." He asked the parties to submit briefs, and then denied the motion to suppress in a written order.

After hearing the evidence at trial, the jury found appellant guilty of DWI, and the trial judge sentenced him to 90 days in the county jail, probated for one year, and an $800 fine.

In his sole issue on appeal, appellant claimed that the search-warrant affidavit failed to establish "recent" probable cause. The court of appeals, relying upon the "uninterrupted sequence of events outlined in the affidavit," rejected this claim:

> Viewing the facts and circumstances within the four corners of the affidavit, specifically the factual time-line given by the officer, interpreting the affidavit "in a common sense and realistic manner," and drawing all reasonable inferences, we conclude the June 7, 2008, 1:07 a.m. finding of probable cause by the magistrate was of reasonable proximity to the June 6, 2008 arrest of appellant. We cannot say it was unreasonable for the magistrate to presume some evidence of intoxication would be found in appellant's blood when the warrant was signed.[4]

## II.

The Fourth Amendment requires that "no warrants shall issue, but upon probable

---

[4] *Crider*, 2010 WL 1294094 at *2.

cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[5]  The probable-cause standard means that the affidavit must set out sufficient facts for the magistrate to conclude that the item to be seized will be on the described premises at the time the warrant issues and the search executed.[6] Thus, in a seminal 1932 case, we first held that an affidavit

> is inadequate if it fails to disclose facts which would enable the magistrate to ascertain from the affidavit that event upon which the probable cause was founded was not so remote as to render it ineffective.[7]

Affidavits are to be read "realistically and with common sense," and reasonable inferences may be drawn from the facts and circumstances set out within the four corners of the affidavit.[8]  But there must be sufficient facts within the affidavit to support a probable-cause finding that the evidence is still available and in the same location.  We agree that the "proper method to determine whether the facts supporting a search warrant have become stale is to examine, in light of the type of criminal activity involved, the time elapsing between the

---

[5] U.S. CONST. AMEND IV; *see Jordan*, 342 S.W.3d at 568.

[6] *Schmidt v. State*, 659 S.W.2d 420, 421 (Tex. Crim. App. 1983) ("The facts submitted to the magistrate . . . must be sufficient to justify the conclusion that the property that is the object of the search is probably on the premises to be searched *at the time the warrant issues.*"); *Cassias v. State,* 719 S.W.2d 585, 588 (Tex. Crim. App.1986).

[7] *Garza v. State*, 48 S.W.2d 625, 627-28 (Tex. Crim. App. 1932) (op. on reh'g).

[8] *Davis v. State*, 202 S.W.3d 149, 154 (Tex. Crim. App. 2006); *Hankins v. State*, 132 S.W.3d 380, 388 (Tex. Crim. App. 2004).

occurrence of the events set out in the affidavit and the time the search warrant was issued."[9]

No hard-and-fast rule sets the outer limit of time between stopping an apparently intoxicated driver and the existence of probable cause that evidence of intoxication will still be found within that person's blood. The ultimate criteria in determining the evaporation of probable cause are not found in case law, but in reason and common sense. The hare and the tortoise do not disappear over the hill at the same speed. The likelihood that the evidence sought is still available and in the same place is a function, not just of the watch or the calendar, but of the particular variables in the case:

(1)    the type of crime–short-term intoxication versus long-term criminal enterprise or conspiracy;

(2)    the suspect–"nomadic" traveler, "entrenched" resident, or established ongoing businessman;

(3)    the item to be seized–"perishable and easily transferred" (evanescent alcohol, a single marijuana cigarette) or of "enduring utility to its holder" (a bank vault filled with deeds, a "meth lab," or a graveyard corpse); and

(4)    the place to be searched–a "mere criminal forum of convenience or secure

---

[9] *McKissik v. State*, 209 S.W.3d 205, 214 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *Gonzales v. State*, 761 S.W.2d 809, 813 (Tex. App.—Austin 1988, pet. ref'd). As the Tenth Circuit has explained,

> Probable cause is not determined by merely counting the number of days between the time of the facts relied upon and the warrant's issuance. The significance of the length of time between the point probable cause arose and when the warrant issued depends largely upon the property's nature, and should be contemplated in view of the practical considerations of every day life. The test is one of common sense.

*United States v. Brinklow,* 560 F.2d 1003, 1005-06 (10th Cir. 1977) (citations omitted).

operational base."[10]

"[T]he fundamental point is that when the facts put forward to establish probable cause show only a single, nonrecurring crime occurring on a specific occasion, the question to be considered is how long after that [time or] date evidence of that single crime can be expected to remain at the scene."[11]

Alcohol in a person's bloodstream disappears quite rapidly, thus the facts cited to support probable cause to search for alcohol in a DWI suspect's bloodstream become stale quite rapidly. Blood-alcohol levels are usually described in terms of blood-alcohol content (BAC). BAC refers to the concentration of alcohol in the blood, measured in grams of alcohol for every one hundred milliliters of blood volume.[12] Hypothetically, a person whose blood had one gram of alcohol for every one hundred milliliters of blood would have a BAC of 1 and a blood-alcohol concentration of 1% ("weight per volume"). This is hypothetical because a person with a BAC of 1 would literally be pickled in alcohol. A person whose

---

[10] *See United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006) ("The expiration of probable cause is determined by the circumstances of each case, and depends upon the inherent nature of the crime. Relevant variables include 'the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?)'") (citations omitted); *Andresen v. State*, 331 A.2d 78, 106 (Md. Ct. Spec. App. 1975), *aff'd* 427 U.S. 463 (1976).

[11] 2 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 3.7(a) at 375-76 (4th ed. 2004).

[12] TEX. PENAL CODE § 49.01(1)(B); *see* JOHN BRICK, *Characteristics of Alcohol: Chemistry, Use, and Abuse,* in HANDBOOK OF THE MEDICAL CONSEQUENCES OF ALCOHOL AND DRUG ABUSE 3 (John Brick ed., 2004); WILLIAM J. CHAMBLISS, COURTS, LAW, AND JUSTICE 64 (2011).

blood contains 0.10 grams of alcohol for every one hundred milliliters of blood will have a BAC of 0.10 (a more realistic and typical situation). Every hour, the "average" person eliminates somewhere between 0.015 and 0.020 grams of alcohol for every one-hundred milliliters of blood.[13] In other words, a BAC of 0.10 will go down by 0.015 to 0.020 every hour in an average person.

Assuming that a suspect did not drink after being stopped by an officer, at least "some" evidence of alcoholic "intoxication" (defined as 0.08 BAC) should still be in his blood system four hours later because it takes at least four hours for the average person to eliminate 0.08 grams of alcohol (per one hundred milliliters of blood) at a rate of 0.02 grams of alcohol (per one hundred milliliters of blood) per hour. Put simply, it takes four hours of hourly 0.02 BAC decreases to make a BAC of 0.08 drop to zero.

The higher the level of intoxication at the time of the stop, the longer some evidence of alcoholic intoxication would remain in the blood. For example, if the average person's blood-alcohol level were twice the limit of legal intoxication, with a BAC of 0.16 at the time he were stopped, his level would be approximately 0.08 four hours later, and some level of alcohol would still be in his blood up to seven to eight hours later.[14] But it would be

---

[13] *See State v. Mechler*, 153 S.W.3d 435, 448 (Tex. Crim. App. 2005) (Cochran, J., concurring); *Mata v. State*, 46 S.W.3d 902, 906 (Tex. Crim. App. 2001) (Johnson, J., concurring).

[14] *See, e.g., State v. Dugas*, 296 S.W.3d 112, 117-18 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (magistrate had a substantial basis for concluding that evidence of intoxication would be found in defendant's blood even though no time of arrest was set out in the affidavit because a maximum of six hours could have elapsed from the time officer stopped defendant

exceedingly unlikely that a person who was tested some 24 hours after he ceased drinking would register any detectible level of alcohol in his blood. (This would correspond to an initial blood-alcohol content of 0.48, six times the legal limit and nearly lethal.)[15]

With these general principles in mind, we turn to our recent, unanimous decision in *Jordan v. State*[16] concerning staleness in DWI search-warrant affidavits for blood and contrast it to the present case.

## III.

In *Jordan*, the police officer presented his search-warrant affidavit to the magistrate on June 6, 2008.  The magistrate signed the warrant at 3:54 a.m.  The officer's affidavit stated that the defendant "committed the offense of Driving While Intoxicated on June 6, 2008, and then described the driving and intoxication that constituted elements of that offense."[17] We noted that the magistrate "needed to know when the [defendant] was stopped in order to determine the probability that evidence of an offense would be found in the [defendant's] blood at the time the warrant issued."[18]

---

until the time magistrate signed warrant).

[15] *See, e.g.*, E. Wilson & W.S. Waring, *Severe Hypotension and Hypothermia Caused by Acute Ethanol Toxicity*, 24 J. EMERGENCY MED. e7 (2007) ("Concentrations [greater than] . . . 450 mg/dl . . . are potentially fatal, and associated with coma, respiratory arrest, and circulatory collapse"). 450 mg/dl is equivalent to 0.45 grams per one hundred milliliters, or a BAC of 0.45.

[16] 342 S.W.3d 565 (Tex. Crim. App. 2011).

[17] *Id.* at 570.

[18] *Id.*

The officer should have included the time that he stopped or arrested the defendant.[19]

As Professor LaFave has stated, if "the time of the occurrence of the facts relied upon is critical in determining whether there is probable cause to search, then surely 'failure to state when the alleged facts occurred is fatally defective.'"[20] Nonetheless, that omission was not fatal in *Jordan* because the officer *did* say that the defendant had committed the offense on June 6th, so necessarily there was less than a four-hour interval between the initial stop and the signing of the warrant at 3:54 a.m. on that same date. Thus, it was unlikely that all evidence of intoxication had dissipated from the defendant's blood in that four-hour period, given the intoxication symptoms set out in the affidavit.[21]

Compare that four-hour window in *Jordan* with the twenty-five-hour window in the present case. Here, Sgt. Henderson stated in his affidavit that he saw appellant make a left-hand turn without signaling on June 6, 2008. No time is mentioned. Nothing in the affidavit indicates whether it was light or dark outside.[22] No fact within the affidavit could help

---

[19] A number of recent appellate opinions would have been wholly unnecessary if this simple fact were automatically and routinely included in all DWI blood search-warrant affidavits.

[20] 2 WAYNE LAFAVE, *supra* note 11, § 3.7(b) at 392.

[21] *Id.* at 571.

[22] *Compare Wheat v. State*, No. 14-10-00029-CR, 2011 WL 1259642, *5 (Tex. App.—Houston [14th Dist.] April 5, 2011, pet. ref'd) (not designated for publication) (despite officer's failure to list the time that he stopped DWI defendant, affidavit for search warrant sufficed to show that evidence of intoxication would still be found in defendant's blood because the affidavit stated that the defendant was stopped on the same August date that the affidavit was written, the officer stated that he had asked the defendant if she had been drinking *that night*, and the affidavit was faxed to the magistrate at around 12:30 a.m. the next morning; reasonable to infer that the defendant was stopped after dark in August and therefore the time frame between

inform the magistrate about when on June 6th Sgt. Henderson saw this turn. Sgt. Henderson stopped appellant and noticed that appellant (1) had "a strong odor of alcoholic beverage"; (2) had "bloodshot eyes"; (3) had "thick-tongued" speech; (4) "sway[ed] heavily." Based on these observations, as well as "clues" during an HGN test, Sgt. Henderson arrested appellant and asked him to give a breath test. Appellant refused.

The next day, at 1:07 a.m., a magistrate signed Sgt. Henderson's affidavit in support of a search warrant for blood. There was ample probable cause to believe that appellant was intoxicated at the time he was driving. But nothing in "the four corners" of the affidavit[23] suggests what time gap existed between the last moment of driving and the moment the magistrate signed the warrant. The longer the time gap between the initial stop and the eventual signing of the warrant, the less likely that evidence of intoxication would still be found in appellant's blood. We know that the gap was more than one hour, but it could have

---

stop and sending affidavit was no more than about four to five hours); *Jezek v. State*, No. 03-09-00575-CR, 2010 WL 3431677, *3-4 (Tex. App.—Austin Aug. 31, 2010, no pet.) (not designated for publication) (although affidavit failed to state the time that a traffic stop occurred, it included other facts from which the magistrate could reasonably infer that some alcohol would still be in defendant's blood; officer stated in his affidavit that defendant was pulled over for failing to dim her high beams, that she had admitted to drinking earlier in the evening, and that after defendant was taken to the police station, an officer was called to help conduct an intoxilyzer test at 3:42 a.m. that morning and search warrant was issued at 4:52 a.m.; sufficient facts to support conclusion that original stop occurred shortly before or after midnight).

[23] We are required to assess probable cause in an affidavit by looking solely within the "four corners" of the affidavit, although we, like the magistrate, may draw reasonable inferences from the specific facts set out in that affidavit. *Hankins v. State*, 132 S.W.3d 380, 388 (Tex. Crim. App. 2004).

been as much as twenty-five hours.[24]

The State argues, and the court of appeals agreed, that Sgt. Henderson must have performed an "unbroken chain" or "uninterrupted course" of action between stopping appellant, determining that he was intoxicated, arresting him, writing out an affidavit, and obtaining the magistrate's signature on the search warrant. But there is no fact in the affidavit that would support such an inference and no language indicating any amount of time that may have elapsed between the various events. "It is one thing to draw reasonable inferences from information clearly set forth within the four corners of an affidavit . . . [but it] is quite another matter to read material information into an affidavit that does not otherwise appear on its face."[25] There is simply no fact in this affidavit that would give rise to a reasonable inference that Sgt. Henderson performed an "unbroken chain" of actions that connected his detention of appellant to the signing of the warrant within a sufficiently short

---

[24] *See United States v. Button*, 653 F.2d 319, 324-25 (8th Cir. 1981). This case gave rise to the so-called "*Button* Rule" of staleness:

> Generally when the courts are forced to make an assumption as to when transactions occurred "within" a given period, for purposes of determining probable cause, it must be assumed that the transactions took place in the most remote part of the given period. . . . The reason for this policy is obvious. If this were not the construction given to this phrase, stale information could be made to appear current by the mere use of "within" language. For example, if a dozen drug purchases were made in the first week of January and one wished to obtain a search warrant in the first week of March based solely on this information he would need only say that "within the last two months a dozen purchases were made", rather than "a dozen purchases were made in the first week of January."

*Id.* at 324-25 (quoting *Commonwealth v. Novak*, 335 A.2d 773, 774 (Pa. Super. Ct. 1975)).

[25] *Cassias v. State*, 719 S.W.2d 585, 590 (Tex. Crim. App. 1986).

time frame that evidence of intoxication would still be in appellant's blood.[26]

Under the totality-of-the-circumstances test and giving due regard to all reasonable inferences that can be drawn from the stated facts, the affidavit in this case, unlike the one in *Jordan*, does not contain sufficient facts within its four corners to establish probable cause that evidence of intoxication would be found in appellant's blood at the time the search warrant was issued.

We therefore reverse the judgment of the court of appeals and remand this case to the trial court for further proceedings not inconsistent with this opinion.

Delivered: November 16, 2011
Publish

---

[26] *See Schmidt v. State*, 659 S.W.2d 420, 421 (Tex. Crim. App. 1983) (when no facts in the affidavit demonstrated at what time an incident took place, "[i]t is apparent that the magistrate could not ascertain the closeness of time to issue the warrant based on an independent judgment of probable cause") (quoting *Heredia v. State*, 468 S.W.2d 833, 835 (Tex. Crim. App. 1971)).  The facts and holding of *Schmidt* were discussed in some detail in *Jordan*, in which we stated,

> The problem in *Schmidt* was that the affiant described a series of events of indeterminate duration—from driving while sniffing cocaine, to finding the vehicle, to calling the ambulance, to providing medical treatment. The magistrate needed to know how much time elapsed between the events and the submission of the affidavit in order to determine the probability of evidence's being found in the vehicle when a warrant issued. But the only date given was that of the alleged possession, while the events supporting the allegation could have occurred at some remote time.

*Jordan*, 342 S.W.3d at 570-71.  The problem in this case is the same as that in *Schmidt*–the affiant described a series of events of indeterminate duration–from seeing appellant turn left without signaling, to stopping his car, to requesting field sobriety tests, to conducting an HGN test, to arresting appellant, to transporting him to the police station, to asking him to give a breath sample, to drafting an affidavit for a search warrant, to finding a magistrate, to faxing the affidavit and warrant to the magistrate.  There is nothing in the affidavit to show when these events began or how long each one took.